## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| POST HOLE VENTURES, LLC,<br>*Plaintiff* | § § § | |
| —vs— | § § | SA–21–CV–00980–XR |
| CITY OF KERRVILLE, TEXAS,<br>*Defendant* | § § § § | |

## ORDER

On this day, the Court considered Defendant City of Kerrville's ("Kerrville" or the "City") motion for summary judgment (ECF No. 108), Plaintiff Post Hole Ventures, LLC's ("PHV") motion for partial summary judgment (ECF No. 104), and Kerrville's motions to exclude certain testimony (ECF Nos. 106, 107). After careful consideration, Kerrville's motion for summary judgment (ECF No. 108) is **GRANTED**, PHV's motion for partial summary judgment (ECF No. 104) is **DENIED**, and Kerrville's motions to exclude expert testimony (ECF Nos. 106, 107) are **DENIED AS MOOT**. Considering this outcome, Kerrville's opposed motion to stay the Court's decision (ECF No. 118) is **DENIED AS MOOT**.

## BACKGROUND[1]

This case revolves around a dispute over a development project in Kerrville, Texas. PHV asserts that the City violated its substantive and procedural due process rights by "impermissibly"

---

[1] The Court notes that neither party provided adequate references to the record. The Court is not obligated to pierce the record itself to determine the undisputed facts. *See Bookman v. Shubzda*, 945 F. Supp. 999, 1004 (N.D. Tex. 1996) ("To satisfy her burden, the nonmovant is 'required to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence support[s] her claim. 'Rule 56 does not impose upon a district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'") (citations omitted). Nevertheless, the Court has done so here and lays out facts to the extent the record demonstrates they are undisputed, unless otherwise noted.

and "effectively" revoking its property right in its building permit. PHV seeks monetary damages under Section 1983 and mandamus relief to order the City to "hear" its appeal. Because PHV lacks a property right in the permits at issue and fails to clear the hurdle under *Monell*, its claims for damages and mandamus relief fail as a matter of law.

A. **Initial Development and Permit Application**

PHV, whose sole member is Lee Brent Bates ("Bates"), owns property in the River Guide Village where it planned to build a three-story high-end commercial office and professional space. ECF No. 25 at 1, 3; ECF No. 112-3 at 250. At the outset, Bates presented this development project to Kerrville's Chief Building Official, Brian Hunt ("Hunt"),[2] and other City officials, and applied for a building permit. ECF No. 112-3 at 242–43. Along with its application, PHV submitted construction plans for the building, which included a completed floor plan for the top floor and a partially completed plan for the two lower floors, based on the tenant composition at the time. *Id.* As more tenants leased space and finalized their floor designs and finishes, PHV would submit more plans to obtain additional permits. *Id.* at 68, 243.

Based on the then-existing plans, in or about September 2018, Hunt determined that the building would not require a fire sprinkler system, areas of refuge, or certain fire-rated doors based on its estimated occupancy load of sixty people.[3] ECF No. 112-3 at 243; ECF No. 112-1 at 117. Under Kerrville's City Code of Ordinances ("City Code"), this determination is made by the Chief

---

[2] Hunt left this position in or about July 2019. *See* ECF No. 111 at 9.

[3] Hunt contends he made this determination based on the International Building Code ("IBC") and the International Fire Code ("IFC") but does not explain his calculations. *See* ECF 243 ¶ 7. That said, the City Code has adopted both the IBC and the IFC. *See* KERRVILLE CODE OF ORDINANCES, ART. II, SEC. 26-31(8) (adopting the IBC and IFC for occupancy classification). The City adopted the 2006 IBC and later adopted the 2018 IBC in 2021. Section 1004.1 of the 2006 IBC provides the following formula to calculate the occupancy load: the floor area under consideration divided by the occupant per unit of area factor as set forth under the code. ECF No. 112-3 at 130. Under Section 1004.1.1, an exception can be made *where approved by a building official*, under which the occupancy load is calculated by using the "actual number of occupants for whom each occupied space, floor or building is designed." *Id.* (emphasis added). In other words, under this exception, the occupancy load would be lower if the actual number of occupants is lower than the occupant per unit area factor as set forth under the code.

Building Official "when plans and/or a permit application are received for review by the City, or at the time that an existing building is changing occupancy type." KERRVILLE CODE OF ORDINANCES, ART. II, SEC. 26–31(8).[4]

On September 28, 2018, and after review by Hunt, PHV's plans were approved. *Id.* The City issued a permit to PHV (the "Building Permit") and construction began. ECF No. 112-1 at 102.

The Building Permit, on its face, states that it is for an "Office Space," *id.*, and contains no restrictions on its scope, such as being a "shell only" permit (which would only cover the construction of the exterior of the building). *Contra, e.g.*, ECF No. 112-2 at 283, 285, 288, 290 (other Kerrville-issued permits that contain "shell only" restrictions). Nor does the Building Permit identify any other permits or certificates that would be required as construction progressed or specify the structure's occupancy load. The Building Permit contains a certification signed by the "Contractor or Authorized Agent" which states:

> All provisions of laws and ordinances governing this type of work will be complied with whether specified herein or not[ ] [and] granting of a permit does not presume to give authority to violate or cancel the provision of any other state or local law regulating construction or the performance of construction.

ECF No. 112-1 at 102.[5]

PHV claims the Building Permit granted it the right to complete the construction of the building "unrestricted." ECF No. 111 at 8. Hunt states that the Building Permit was an

---

[4] The City requests that the Court take judicial notice of the City Code under Federal Rule of Evidence 201. *See* ECF No. 113 at 4. As the City Code is not an adjudicative fact, the Court does not need to take judicial notice of it. To the extent the Court references the City Code, it uses the City Code and incorporated standards in existence at the time of the action being evaluated. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring) ("The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal").

[5] Bates is listed as the "Contractor" on the Building Permit. *Id.*

"unrestricted full building permit" *only* to construct the building "according to the approved construction plans," which, here, meant the "entire top floor of the building along with portions of each of the other floors." ECF No. 112-3 at 243–44. In other words, while "unrestricted" to these initial exterior and interior areas, it did not cover the remaining portions of the building. The City, on the other hand, asserts the Building Permit was a "shell-only" permit, which only permitted construction of the exterior of the building. ECF No. 108 at 1.[6]

PHV, for its part, acknowledges that other permits, such as plumbing, electrical, and a "finish out" permit, as well as a Certificate of Occupancy was needed to be obtained as construction progressed. ECF No. 111 at 9–10; ECF No. 112-3 at 68.[7] On September 13, 2019—nearly a year after PHV received the Building Permit—Bates sent a letter to the City stating that PHV would apply for permits "for final floor plan layout, plumbing, electrical, HVAC and required Fire Protection and preventions systems" and that "when tenants and floor plans are finalized, and the final interior finish out permit applied for and approved, [PHV] will be ready to finish out the space." ECF No. 112-3 at 68.[8] Indeed, PHV admits the additional tenants would "significantly impact[ ]" the finalized plans. ECF No. 111 at 9.

---

[6] While PHV, Hunt, and the City's disagreement over the scope of the Building Permit raises a disputed issue of fact, it is not a disputed issue of *material* fact because "its resolution could [not] affect the disposition," *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir. 2015), of PHV's Due Process claims. No reasonable jury could believe the Building Permit was "unrestricted" to completion. *See infra* at 20. While PHV's Due Process claims rest on a deprivation of property, Bates admits that the Building Permit has not been rescinded. ECF No. 113–1 at 5. Moreover, PHV provides no evidence that any of the contested actions were *based on* the nature of the permit. In other words, but-for a change in the type of permit, PHV would not have been required to comply with the City's requests.

[7] The plumbing permit was obtained on October 31, 2018, and the electrical permit was obtained on March 31, 2020, *see* ECF No. 112-3 at 62; ECF No. 112-1 at 104. The Certificate of Occupancy has never been issued.

[8] Bates sent this letter in response to a notice from the City that additional inspections would be required before the Certificate of Occupancy could be issued. ECF No. 112-1 at 103. PHV and the City dispute whether other language in Bates's letter that refers to PHV "trying to get the shell of the building 'dried in'" suggests that the Building Permit was a "shell only" permit. ECF No. 111 at 9.

An iterative process ensued. PHV continued to update the City on the project's development, and the City responded with concerns.[9] For example, on December 12, 2019, the City requested certain documents related to the structural integrity of the concrete foundation and that building support systems were needed to issue a Certificate of Occupancy. ECF No. 112-1 at 103. Over the next few months, PHV submitted more documents to the City, including additional interior, floor, and electrical plans. ECF No. 111 at 10; ECF No. 112-3 at 252 (submitting other documents in January 2020 and June 2020).[10] While PHV considered these to be "complete floor plans," ECF No. 112-1 at 117, the City did not find these submissions sufficient to issue the final permits, including the "finish out" permit and Certificate of Occupancy.

### B. <u>Stop Work Order and Alleged Building Permit Modification</u>

On April 22, 2020—after construction had progressed for almost two years—PHV was issued a Stop Work Order by Stephen Riggs, Kerrville's building inspector at the time.[11] ECF No. 112-3 at 252. The Stop Work Order was issued because the City discovered that PHV had begun certain work without necessary permits or submission of plans. ECF No. 112-3 at 128. The Stop Work Order stated that "Permits, Final Floor Plan Layout, and required Fire Protection Have Not

---

[9] For example, on October 7, 2019 PHV advised Kerrville that tenant leasing and space planning was not complete but that it would submit the final plans as soon as tenant spacing was finalized. ECF No. 112-3 at 252.

[10] In March 2020, PHV gave the City updated interior plans alongside its application for an electrical permit, which was issued at the end of the month. *Id.*; ECF No. 112-1 at 104.

[11] A Stop Work Order is issued under Section 114.1 of the 2006 IBC (in effect as of April 22, 2020) "[w]henever the building official finds any work regulated by [the 2006 IBC] being performed in a manner either contrary to the provisions of this code or dangerous or unsafe, the building official is authorized to issue a stop work order." *See also* ECF No. 112-1 at 100 (Section 115 of the 2018 IBC). The Stop Work Order "shall be in writing and shall be given to the *owner* of the property involved," and "[u]pon issuance of a stop work order, the cited work shall immediately cease." 2006 IBC § 114.2, available at bcpad.net/Code Books/IBC 2006.pdf. The "stop work order shall state the reason for the order and the conditions under which the cited work will be permitted to resume," and "[a]ny person who shall continue any work after having been served with a stop work order, except such work as that person is directed to perform to remove a violation or unsafe condition, shall be subject to penalties as prescribed by law." *Id.* §§ 114.2 (Issuance), 114.3 (Unlawful continuance).

Been Issued as Agreed to In Letter Dated 9/13/[19]."[12] *Id.* The Stop Work Order also referenced the "Failure to Obtain Finish Out Permits as Agreed To." *Id.*

While the specific provisions of the City Code or violations of the Building Permit are not explicitly cited on the Stop Work Order, the missing material lines up with what Bates agreed to provide the City in his September 13, 2019 letter: a "final floor plan layout," "fire protection and preventions system" that still needed to be obtained, as well as the "finish out permit" that would be *applied for* and *approved*. ECF No. 112-3 at 68. Still, PHV contends that it either was not required to submit these plans or had already submitted sufficient plans. ECF No. 111 at 10; ECF No. 112-3 at 252.

On April 27, 2020—five days after the Stop Work Order was issued—Dorothy Miller changed the development project description in the City's building project management software from "office space" to "office space–shell only." *See* ECF No. 112-3 at 25 (Deposition of Charvy Tork, 126:20–23); ECF No. 112-3 at 77. Dorothy Miller is an administrative assistant in the Kerrville Development Services/Engineering Department. *See* ECF No. 112-3 at 181, 252.

Then, in or around May or June 2020, the City informed PHV that the occupancy load assigned by the City would be 213 persons, ECF No. 112-3 at 130–31, over three times the 60-person occupancy load that PHV had assumed based on Hunt's determination in or about September 2018. The City explained that the revised occupancy load determination, consistent with the Fire Marshal's occupancy findings, was based on the square footage of the building under the 2006 IBC,[13] and calculated "for the life of the building and not [based] on what a tenant or

---

[12] While the Stop Work Order states 9/13/20, this can only be understood as a typographical error since 9/13/20 was in the future. PHV submitted the 9/13/19 letter as part of the record, *see* ECF No. 112-3 at 68, but there is no letter dated 9/13/20 in the record.

[13] The 2006 IBC was in effect at the time. While the 2018 IBC (not yet in effect) slightly altered the occupancy calculation, the load under the 2018 IBC would still have been higher than the number PHV assumed. *See* ECF No. 112-3 at 167–68.

owner's assertion of use is today or in the future," because "[g]ranting an exception to the occupant load could put lives at-risk." ECF No. 112-3 at 128.[14] Under this occupancy load, PHV needed to install more robust fire safety systems in the building. *Id.* PHV seeks to install a fire safety system based on the initial, 60-person occupancy load instead. *See* ECF No. 112-3 at 138–39.

Following these developments, PHV began resubmitting its plans for the development using the City's permitting website, My Government Online. *See* ECF No. 112-1 at 106–111.[15] After PHV's first supplemental submission on May 11, 2021 of "compliance documents, [and] architectural and engineering design[s]," *see* ECF No. 111 at 13, the City responded that certain requirements still needed to be completed pursuant to the Fire Marshal Review and Building Plan Review. *See* ECF No. 112-1 at 114. To date, none of these have met the City's requirements to continue the development.[16]

## C. **Appeals Process**[17]

The Stop Work Order and PHV's resistance to Kerrville's requirements to lift it and allow the project to continue set off a wave of appeals by PHV to restart construction.

---

[14] Nothing in the record demonstrates that the City knew of Hunt's prior determination of an occupancy of around sixty people. Neither party has pointed to any provision of the City Code governing changes in the occupancy determination while a building is under construction, or whether the City had any discretion to modify its determination. The only provision the Court found was regarding occupancy changes to in the context of electrical permits. *See* ECF No. 112–1 at 41; KERRVILLE CODE OF ORDINANCES, ART. III, SEC. 26–61(D)(3)(C)(III). Because PHV already obtained an electrical permit, this is not applicable. Moreover, the City contends that since the Building Permit was issued, the construction type of the building "changed four times, each of which has required the application of a different building code requirements." ECF No. 112-1 at 122. PHV does not provide evidence to the contrary.

[15] PHV also attempted to continue to work on the building after receiving the Stop Work Order and received citations for doing so. ECF No. 112–3 at 255.

[16] The City also required that PHV's plans have an architect's seal. ECF No. 112–3 at 233. Like the other requirements, PHV contends this was not required at the time PHV obtained its Building Permit.

[17] Unless otherwise stated, the appeals provisions are the same under the 2006 IBC and 2018 IBC (adopted during PHV's appeals).

1.  **The City's Appeal Apparatus**

**Appeal Board.** These appeals are heard by Kerrville's Building Board of Adjustment and Appeals ("BBAA") and governed by Chapter 26 of Kerrville's Code of Ordinances. The BBAA is created by the City and is, among other things, "authorized to hear appeals" and "grant variances." KERRVILLE CODE OF ORDINANCES, ART. VIII, SEC. 26-250(a). It consists of seven members appointed by the City Council. *Id.* § 26-250(b). The BBAA's decisions are "quasi-judicial," and the City Ordinance states that the "requirements of procedural due process necessitate a fair hearing" for proceedings before the BBAA. *Id.* § 26-250(n).[18]

**What Can Be Appealed.** The BBAA "hear[s] appeals of orders, decisions, or determinations made by the Chief Building Official." *Id.* § 26-41(b)(8). Under the City Code, an "owner of a building or structure" or its agent "may appeal a decision of the chief building official or fire code official to the [BBAA] whenever any one of the following conditions are claimed to exist: (1) [t]he chief building official or fire code official rejected or refused to approve the mode or manner of construction proposed to be followed or materials to be used in the installation or alteration of a building, structure, building component, or life safety system; (2) [t]he provisions of a standardized building code do not apply in this specific case; (3) [t]hat an equally good or more desirable form of installation can be employed in a specific case; or (4) [t]he true intent and meaning of standardized building code or any of the regulations thereunder have been misconstrued or incorrectly interpreted." *Id.* § 26-251(a).

If unsuccessful, the party may appeal again to the City Council. *Id.* § 26-251(d).

---

[18] Under the 2018 IBC, the BBAA may "obtain the assistance of persons who are qualified by experience and training on a particular subject under consideration" when considering the appeal. ECF No. 112-1 at 75; KERRVILLE CODE OF ORDINANCES, ART. VIII SEC. 26-41(b)(8).

**Form of Appeal.** An appeal must be in writing on a form established by the City and must provide, among other information, (1) a citation to the section of the building code, state statute, ordinance or other law that is the subject of the appeal, (2) the date the allegedly erroneous decision was communicated, (3) the specific ground on which the appeal is based, and (4) an alternative, but equally effective, way of addressing the code provision. *Id.* § 26-251(b).

An appeal to the BBAA (or City Council) also has timing requirements. It must be filed "with the director of development services not later than ten business days" after the date of the chief building official or fire code official communicated the decisions. *Id.* § 26-251(c). While the BBAA "shall" hold a hearing within ten days after the filing and perfection of the appeal, if it does not, the appeal "shall" be submitted to the City Council for "final action" at a regular meeting. *Id.* § 26-251(d).

**Appeal vs. Variance.** Unlike an "appeal," a variance can be granted in the BBAA's discretion when, after an appeal and a hearing, the BBAA is of the opinion that the enforcement of the specific code "would do manifest injustice and would be contrary to the spirit and purpose of" the building code or public interest, along with a list of four other factors: (1) that special conditions and circumstances exist which are peculiar to the building structure, (2) that these do not result from the action or inaction of the applicant, (3) that granting the variance will not confer on the applicant any specific privilege that is denied by the building code to other buildings, (4) that the variance granted is the minimum which will make the reasonable use possible, and (5) it is in harmony with the general intent and purpose of the building code. *Id.* § 26-251(e).

**2. PHV's Appeals**

PHV's appeals centered on three claims: (1) the City improperly recalculated the development's occupancy load, (2) the City improperly characterized the occupancy load appeal

as a variance rather than an appeal, and (3) the City improperly denied PHV "finish out" permits, or in the alternative improperly modified its initial permit from "unrestricted" to "shell-only."

**Occupancy.** On July 28, 2020, PHV appealed the determination of the occupancy load under Section 1004, arguing that an exception allowing occupancy to be determined based on actual use applied to the calculation. *See* ECF No. 3 at 40.[19] If the exception applied, PHV could instead install a "limited area fire sprinkler system, or other equivalent method," rather than the fire protection systems that the City required. *Id.* After the BBAA declined to act on this appeal, ECF No. 112-3 at 231, it was heard by the City Council on September 8, 2020.[20] The City Council denied the appeal by a vote of 5-0, *see* ECF No. 3 at 54; ECF No. 112-3 at 240. PHV did not further appeal the decision.[21]

**Variance.** PHV contends that the City used the wrong standard when it rejected its occupancy appeal by a 5-0 vote. The City Council did treat the issue as a request for a variance.[22] PHV argues that the proper standard was an "appeal," not a "variance," which implicates other considerations. While PHV claims the City treated its appeal as an application for a variance because variances are held to a higher standard and thus less likely to be approved, *see* ECF No. 111 at 29, the City's Corporate Representative, Andrew Wayne Paxton, stated that the reason for

---

[19] *See supra* note 3.

[20] Under the City Code, the BBAA can choose to not hear an appeal, § 26-251(d), which is then submitted to the City Council for a decision.

[21] Nearly eight months later, PHV filed another appeal to the BBAA regarding the same determination. *See* ECF No. 3 at 57–60. The City Attorney, Mike Hayes, rejected this second appeal for the same reason the first was rejected. *See* ECF No. 3 at 61 ("As nothing has changed since your last appeal to BBAA and Council in terms of any new submittals by you to the City, we stand by the previous decision and don't believe you may essentially re–appeal this issue").

[22] *See* ECF No. 112-3 at 238 (questioning whether there was a "specific condition or circumstances which exists that's peculiar to the building).

treating the appeal as a variance was that PHV's requested outcome was to amend the Code for the specific development. ECF No. 112-3 at 215.

**Finish Out Permits.** Encumbered by this higher occupancy determination, PHV continued to submit proposals to overcome the City's concerns to acquire the permits necessary to complete the development, including the "finish out" permit. PHV's submissions did not satisfy the City's requirements, however, and the City continued to insist that PHV's revised plans were not complete or accurate. *See* ECF No. 112-1 at 122–26.

On June 11, 2021, PHV appealed the City's decision not to approve a new "finish out" permit or to reinstate the existing permit. *See* ECF No. 3 at 62–72. This appeal, PHV noted, did "not [] request [] any type of variance from the code" but rather sought a hearing by the BBAA on its new evidence (which had already been submitted to the City). *See id.* at 62.

The City informed Bates that it still did not have complete or accurate engineering plans, that PHV's recently submitted architectural plans were being reviewed by a third party,[23] and that other specific information was still required to issue the "finish out" permit. Thus, the City rejected this appeal because it had never "rejected or approve[d]" the "finish out" permit to begin with.[24] Bates also admits that his Building Permit "wasn't rescinded." ECF No. 113-1 at 5.[25]

**Further Appeals.** PHV continued to engage in numerous back-and-forth communications with the City regarding the development. These communications, some emails of which span nearly two hundred pages, dispute the City's determinations regarding what additional information

---

[23] This third-party, ATS, ended up disapproving of these plans, listing numerous deficiencies. *See* ECF No. 112-1 at 126–41. While ATS eventually "conditionally approved" the plans, the City ended up rejecting this determination because it was concerned that ATS failed to consider and/or address major deficiencies. *See id.* at 305.

[24] Like the "occupancy code" issue, PHV again appealed the denial of the "finish out" permit, *see* ECF No. 112-1 at 162, which the City again denied on the same grounds. *Id.* at 164–65.

[25] By characterizing these appeals as alternatively seeking "reinstatement of the existing permit," PHV appears to claim that the improper modification of the Building Permit led to the denial of the "finish out" permits.

and structures are required for the development. They also dispute the requirements for the
building that the Chief Building Official and Fire Marshal determined were necessary and allege
constitutional violations. *See* ECF No. 112-1 at 166–283, 289–92. The City acknowledged the
submissions but found that they still did not cure the problems identified in earlier proceedings.
The City informed Bates that it would continue to work with PHV and prepare a "list of the items
it needs to either receive or have resolved in order to grant your permit to finish the building." *See*
ECF No. 112-1 at 293.

More appeals followed. On November 22, 2021, PHV appealed the Stop Work Order. *See*
ECF No. 112-1 at 295–96. This appeal was denied because, among other issues, Section 26-251(a)
of the Code does not provide for appeals of a Stop Work Order.[26] *See* ECF No. 112-1 at 297–98.

The communications escalated. PHV sent the City a letter demanding that the City reverse
its position, accusing City officials of deceit and alleging constitutional violations. *See* ECF No.
112-1 at 299–301. The City held firm, explaining why PHV's appeal of the Stop Work Order was
denied and again identifying the outstanding materials that PHV would need to submit before the
City could issue the finish-out permit. *See* ECF No. 112-1 at 302–06.

PHV continued to appeal prior determinations of the City, *see* ECF No. 112-2 at 307–351
(16 appeals), but the appeals were rejected as untimely under the City Code. *See* ECF No. 112-2
at 47–48. PHV stayed the course, sending multiple demand letters and a nearly three-hundred-page
appeal. *See* ECF No. 112-2 at 53–62 (demand letter); *id.* at 63–305 (appeal); *id.* at 310–19 (demand

---

[26] The City explained that while the closest match would be the provision that allowed an appeal of the "denial of the
mode or manner of the proposed construction," the Stop Work Order did not do this because it denied "any
construction regardless of the mode or manner during the pendency of the Stop Work Order." The City further
explaining that PHV also did not comply with the City Code, which requires an appeal to state which provision of the
City Code was misinterpreted. And it told Bates, contrary to his assertion, that it never directed PHV to complete more
construction work. Instead, the City explained that it needed "complete documents, plans, drawings and information
regarding these areas" at issue. ECF No. 112–1 at 303 (listing exactly what was required of PHV).

letter). Because PHV had already filed suit, the City refused to keep engaging with PHV. *Id.* at 307–08. To date, the development remains in limbo.

### D. This Action

Based on these facts, PHV and Bates initially sued to challenge Kerrville's citations and decisions related to PHV's construction. ECF No. 1. The Amended Complaint (ECF No. 25) asserted three claims under 42 U.S.C. § 1983 for violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution, as well as violations of the Texas Public Information Act ("TPIA"), TEX. GOV'T CODE § 552.321(a).

The Court granted in part and denied in part Kerrville's motion to dismiss. ECF No. 34. In that Order, the Court dismissed Bates's claims without prejudice, dismissed PHV's claims under the TPIA, and dismissed PHV's equal protection claim. The Court determined that PHV could proceed with its substantive and procedural due process claims based on its alleged property interests in the Building Permit, the "finish out" permit, and the Certificate of Occupancy. Only PHV's due process claims against the City remain. PHV seeks damages as well as mandamus relief against the City to compel it to "hear" its appeal.

## LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non–moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986)).[27] "Although Rule 56(e) does not allow a party to rest upon the mere allegations or denials of his pleading when his adversary moves for summary judgment, the Rule does not relieve the movant of his duty to establish the absence of a genuine issue as to material facts. The moving party still has the initial burden, under Rule 56(c), of showing the absence of a genuine issue concerning any material fact, and of showing that judgment is warranted as a matter of law." *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213–14 (5th Cir. 1976) (citations and quotation marks omitted).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," not to force the nonmoving party to disclose every aspect of its anticipated trial strategy. Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e). The Court will not presume that Defendant has met its burden on summary judgment simply by virtue of having filed a motion.

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential

---

[27] PHV's argument that the City relies on an improper summary judgment standard of "no evidence" is wrong three times over. *See* ECF No. 111 at 16–17. First, Kerrville does not rely on the "no evidence" standard under Rule 166(a)(i) of the Texas Rules of Civil Procedure and instead properly moves for summary judgment under the federal standard. *See* ECF No. 108 at 2–3. Second, the federal summary judgment standard does permit a party to move for summary judgment where "there is truly no evidence of an essential element." *Castaneda v. Flores*, No. 5:05-CV-129, 2007 WL 1671742, at *2 (S.D. Tex. June 8, 2007). This is what Kerrville has done. *See* ECF No. 108 at 3; ECF No. 111 at 2 (arguing that case law identifies the crucial issues and that there no evidence in the record to support them). Third, Kerrville points to evidence in the record in support of its motion, including deposition testimony of Bates and PHV's own evidence attached to both its pleadings *and* its appendix in support of summary judgment.

component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## DISCUSSION[28]

### I. Section 1983 Claims

Kerrville seeks summary judgment on PHV's Section 1983 claims.[29] PHV contends that Kerrville modified without cause its Building Permit from an "unrestricted" permit to a "shell

---

[28] The City objected to certain exhibits offered by PHV in its appendices. *See* ECF Nos. 113 at 10–11, 115 at 10. Because the City prevails even considering this evidence, the Court need not address these objections and they are overruled as moot.

[29] The Court would be remiss to not mention that PHV does not mention Section 1983, or the required elements to state a claim for municipal liability, once in its briefing.

only" permit," which "impermissibly" and "effectively nullified" its property rights in the development and violated its rights under the Fourteenth Amendment. ECF No. 111 at 1–2. PHV further asserts that the City's actions in the appeals process, including its occupancy determination, characterization of its appeal as a variance, and refusal to issue "finish out" permits have done the same.[30] PHV also appears to now contend that the Stop Work Order has nullified its property rights because it has caused the project to remain dormant.[31] *Id.* at 21. PHV seeks money damages for these alleged violations.

Kerrville, on the other hand, asserts that PHV lacks any cognizable property right and maintains that PHV cannot establish the required elements under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), which are necessary to hold a municipality liable under Section 1983.

The Fourteenth Amendment prohibits state actors from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV. To obtain redress under the due process clause, a plaintiff must show that (1) it has a property interest and (2) a state actor has deprived it of that interest without due process. *Blackburn v. City of Marshall*, 42 F.3d

---

[30] PHV also asserted myriad issues in its Amended Complaint in support of its claims, including the City's failure to identify specific sections of the City Code which PHV violated, failure to disclose dates of communications related to the City's deliberations, failure to provide City-retained consultants necessary documents, "illegally purging documents to obfuscate and cover-up the illegal, coercive and unethical actions by Kerrville," and improper ex–parte communications. *See* ECF No. 25 at 6–7. Even if these were improper or supported by the summary judgment record, "the Constitution does not mandate error-free decision making," *Ramirez v. Ahn*, 843 F.2d 864, 869 (5th Cir. 1988) and "the due process clause does not require a [municipality] to implement its own law correctly." *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996). More importantly, these alleged errors cannot satisfy *Monell* because PHV does not attribute them to any specific policymaker.

[31] This theory of liability was not pled in the Amended Complaint and is not properly before the Court. *See Cutera v. Bd. Of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Even if it were, it would nonetheless fail because the Stop Work Order, by its nature, does not deprive one of property. PHV still retains its building permit. *See* ECF No. 113-1 at 5. To the extent that PHV argues that but for the change in the Building Permit, PHV would not have been issued the Stop Work Order, that argument was also neither pled nor supported by the record. *See* ECF No. 104 at 17 (alluding to this argument but providing no evidence in support).

925, 935 (5th Cir. 1995). To prevail on its substantive due process claim, a plaintiff must further show that the deprivation was not "rationally related to a legitimate government interest". *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 249 (5th Cir. 2000). To prevail on a procedural due process claim, a plaintiff must show it was denied "an opportunity to be heard at a meaningful time and in a meaningful manner" before (or after) the deprivation. *Mathews v Eldridge*, 424 U.S. 319, 332–33 (1976) (citations and internal quotations omitted). Because PHV fails to demonstrate a property interest, the Court need not reach the reason for the deprivation for substantive due process nor the constitutionally adequacy of Kerrville's procedures.[32] *See Spuler v. Picklar*, 958 F.2d 103, 106 (5th Cir. 1992) ("[I]f there is no protected property interest, there is no process due).

## A. PHV Lacks a Property Right in the Relevant Permits

Claims under procedural and substantive due process both require a plaintiff to identify a protected property interest. *Bryan v. City of Madison*, 213 F.3d 267, 274 (5th Cir. 2000). Property interests are not created by the text of the Constitution but by other sources such as "state law, local ordinances, contracts, and mutually explicit understandings." *Id.; Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1046 (5th Cir. 1998) ("Under this analysis, the hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'").

---

[32] Even if PHV could identify a cognizable property interest, its substantive due process claim would fail because the record reveals that the "actual motivation," *Vineyard Investments, L.L.C. v. The City of Madison*, 440 F. App'x 310, 314 (5th Cir. 2011) for the occupancy change, variance standard, and "finish out" permit all relate to building codes and fire safety. The Stop Work Order, governed by the City Code, also related to concerns over unsafe building construction. These are legitimate government interests and not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Shelton v. City of Coll. Station*, 780 F.2d 475, 477 (5th Cir. 1986); *see also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 199 (2003) (substantive due process failed considering the city's rational basis for its decision, even with evidence that many government officials were personally opposed to the project). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)), and the record is devoid of evidence meeting this standard. *See Bush v. City of Gulfport*, 454 F. App'x 270, 278 (5th Cir. 2011) (evidence that permit denial was due to Mayor's own economic and personal motivations did not create a genuine factual dispute about whether the Mayor engaged in "egregious official conduct").

PHV's procedural due process claims arise from the same set of facts as its substantive due process claim. PHV has had numerous opportunities to be heard, and the City continues to give PHV process to this day. Dissatisfaction with the result is no evidence that process has been denied.

While benefits distributed by the government may give rise to property interests, *see Ridgely v. FEMA*, 512 F.3d 727, 735 (5th Cir. 2008), a mere "unilateral expectation of receiving government referrals" is not sufficient. *Blackburn*, 42 F.3d at 937 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Instead, there must be a "legitimate claim of entitlement." *Id.* at 936 (quoting *Roth*, 408 U.S. at 577).

A "benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989)). A lack of "substantive limits on official discretion" cuts against a finding of a property interest. *See Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 735 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). If the "decisionmaker is not required to base its decisions on objective and defined criteria, but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all, the State has not created a constitutionally protected [property] interest." *Olim*, 461 U.S. at 249 (cleaned up); *see Chavers v. Morrow*, 354 F. App'x 938, 940 (5th Cir. 2009) (per curiam) (unpublished) ("[T]he Supreme Court has explained that we are to look for 'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome *must* follow.") (quoting *Olim*, 461 U.S. at 735–36). The Fifth Circuit directs that ambiguities in state law should be construed "in defendants' favor where a purported property interest is not 'unequivocally granted in clear and explicit terms.'" *Chavers*, 354 F. App'x at 941 (quoting *Babberton v. Tex. Gen. Land Off.*, 783 F.2d 1220, 1223 (5th Cir. 1986)).

"Texas law finds a property interest where an entity 'has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings.'" *Jabary v. City*

*of Allen*, 547 F. App'x 600, 606–07 (5th Cir. 2013) (quoting *City of Houston v. Carlson*, 393 S.W.3d 350, 357 (Tex. App.—Houston [14th Dist.] 2012) (concluding that plaintiff had a protected property interest in his hookah bar's Certificate of Occupancy once it was issued); *see also Bowlby v. City of Aberdeen*, 681 F.3d 215, 220 (5th Cir. 2012) ("Privileges, licenses, certificates, and franchises . . . qualify as property interests for purposes of procedural due process"). Once a plaintiff possesses a "property interest in her business permits," the permit becomes "essential in the pursuit of a livelihood." *Id.* at 220 (quoting *Bell v. Burson*, 402 U.S. 535, 539 (1971)). That said, "[w]here the property interest is a permit, it is usually only recognized as a deprived property interest if a permit or license that has been issued is taken away without due process." *Dolly Varden Mgmt. Inc. v. City of Universal City*, No. 5:21-CV-00001-DAE, 2021 WL 11670026, at *8 (W.D. Tex. Sept. 29, 2021).

Whether a grant of a "building permit" confers a property interest depends on whether the specific facts of the case create an entitlement. *See Chavers*, 354 F. App'x at 940–42 (observing that certain tow-rotation schemes may confer property interests but holding that the ordinance at issue did not do so); *Vineyard Invs., LLC v. City of Madison*, 757 F. Supp. 2d 607, 613–14 (S.D. Miss. 2010), *aff'd*, 440 F. App'x 310 (5th Cir. 2011) (noting that "courts in cases considering whether applicants for building permits have a property interest in the issuance of permits have focused on whether county or municipal officials had discretion to deny the permit").

The key distinction is between *applicants* and *holders* of permits. An applicant for a permit does not have a property interest in the permit; a holder may. But even in a case involving a holder, the determination still rests on whether the permit holder has "more than a unilateral expectation" in the permit's *continued effect* and thus the "inquiry focuses on the official's discretion to revoke

or suspend the permit." *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C.C. 2003) (citations and quotations omitted).

While the Court is unaware of any Texas law or provision of the City Code that provides discretion to arbitrarily rescind a permit, Texas law does afford cities the discretion to issue a new one. TEX. LOC. GOV'T CODE §§ 214.904(a), (b)(1)–(2) (a municipality must either grant or deny a building permit application no later than 45 days following the application and provide notice to the applicant stating the reasons why it is unable to grant or deny the permit). It is common sense that a city may deny a permit based on insufficient or inadequate information, as well as other concerns related to the safety of the building, such as fire safety requirements. Thus, while arbitrary rescission of a previously granted permit could impair a developer's property interest in the permit, a permit applicant has only a "unilateral expectation" that it will receive a new or additional permit, *Roth*, 408 U.S. at 577.

The parties come at the property right from two angles. PHV argues that the Building Permit created an enduring and "unrestricted" property interest to complete the development. It appears to contend that the Building Permit carried with it a fixed occupancy determination and guaranteed "finish out" permits based on a predetermined set of submissions. Thus, according to PHV, the City's actions in modifying the Building Permit from an "unrestricted" permit to a "shell-only" permit deprived PHV of its property interest. And by changing the occupancy determination and denying the "finish out" permits, PHV contends that the City revoked its property right. Kerrville, on the other hand, argues that PHV's property right—the City's "issuance of a permit or its failure to issue a permit"—is a mere entitlement that falls within its complete discretion. Likewise, Kerrville asserts that PHV does not have any entitlement to the occupancy determination under the exception to the City Code.

No reasonable jury could find that the City granted PHV an unrestricted right to complete the entire building without further permits. PHV admits that it knew additional permits were required and continued to submit updated plans as development and construction progressed. The City Building Official who issued the permit—Hunt—also rejects PHV's theory of an unfettered right to completion. Instead, Hunt states that the Building Permit was "unrestricted" as to the portions of the building that were finalized upon application: the entire top floor and portions of each other floor. ECF No. 112-3 at 243–44.

There was no deprivation of a property interest because PHV only had a "unilateral expectation" that it would receive the "finish out" permit and Certificate of Occupancy. These permits are not related to the portions of the plans that PHV submitted in its initial application, but the remaining portions of the building that were yet to be finalized, as PHV acknowledged in its September 13, 2019 letter. Because the City has discretion to grant these permits based on the future submissions of PHV, PHV merely holds a "unilateral expectation" that they will be issued and lacks a property interest in them. PHV's citation to *Dolly Varden Mgmt. Inc. v. City of Universal City* is unhelpful because the City has not "taken away" PHV's Building Permit. *See* ECF No. 111 at 21. Like *Dolly Varden*, the property interest here is "in obtaining a building permit," namely the "finish out" permit and the Certificate of Occupancy. *Dolly Varden Mgmt.*, 2021 WL 11560026, at *8.

Likewise, under the City Code, the City Building Official holds the discretion to grant an exception to PHV's occupancy determination, and PHV has not pointed to any provision in the City Code suggesting that the initial occupancy determination is fixed such that it creates an enduring property interest exempt from changes by the Building Official. Moreover, the Building Permit itself did not even state the occupancy determination, let alone establish an entitlement to

it. Thus, PHV likewise fails to establish a protectable property right in a specific occupancy determination.

Finally, PHV did not have an entitlement to a specific appeal standard. The City's Corporate Representative, Mr. Paxton, explained that City applied the variance standard because PHV was requesting an outcome that would have amended the City Code. The City Code confirms that PHV was requesting the occupancy determination as an *exception*. Asking the City Council to grant such an exception, which is left to the discretion of the "building official," would amount to a change in the Code, not merely an improper determination under the City Code.

### B. *Monell Liability*

Even if PHV had a protected property right in the Building Permit or initial occupancy classification, its § 1983 claims would fail because PHV has not established the required elements under *Monell*. To state a Section 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *James v. Tex. Collin County,* 535 F.3d 365, 373 (5th Cir. 2008). A person for these purposes includes a municipality if the action claimed to be unconstitutional implemented a "decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. But a municipality does not automatically incur Section 1983 liability for injuries caused by its employees, and it cannot be held liable on a *respondeat superior* theory. *Id.* at 691. "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 415 (1997).

To establish municipal liability under *Monell*, a plaintiff must identify: (1) an official policy; (2) promulgated by the municipal policymaker; (3) that was the moving force behind the

violation of a constitutional right. *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

"[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). "Only the actions of district officials with final policy-making authority subject the district to such liability." *Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995). It is "not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." *Brown*, 520 U.S. at 404. Instead, a plaintiff "must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Id.* "[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a causal link between the municipal action and the deprivation of federal rights." *Id.*

Under the first prong of *Monell* liability, the Fifth Circuit recognizes three methods for a plaintiff to show an "official policy:" (1) "written policy statements, ordinances, or regulations;"(2) a "widespread practice that is so common and well-settled as to constitute a custom that fairly represents" the municipality's policy; or (3) under "rare circumstances," a single act can be considered a policy if done by an official or entity with final policymaking authority. *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (citations and quotations omitted). This third formulation—ratification—posits that a plaintiff satisfies the policy standard where she shows that "a final decisionmaker[ ]" adopted "a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Brown*, 520 U.S. at 410 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).

Under a ratification theory, "a single decision by a policy maker may, under certain circumstances, constitute a policy for which the county may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000). In those cases, a municipality can be liable only if the decision to adopt action resulting in the constitutional deprivation is properly made by that government's authorized decisionmakers. *See id.* Such "authorized decisionmakers" are defined to be officials "'whose acts or edicts may fairly be said to represent official policy'" and whose decisions may therefore result in municipal liability under § 1983. *Id.* at 480 (quoting *Monell*, 436 U.S. at 694). "[W]hether a particular official has 'final policymaking authority' is a question of *state* law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citations omitted).

Finally, a plaintiff must also establish that the wrongful action was causally connected to the deprivation. *See James*, 535 F.3d at 373. Satisfaction of this element requires Plaintiff to "show that the municipal action was taken with the requisite degree of culpability" and is causally related to "the deprivation of federal rights." *Id.*

PHV offers no evidence of "written policy statements, ordinances, or regulations" that it challenges. Indeed, PHV does not challenge any specific provision of the City Code regulating the issuance of permits or Stop Work Orders. Nor does PHV offer evidence of a "widespread practice" capable of triggering municipal liability as to its substantive due process claim. Merely referencing a variety of actors in a building permitting process does not turn assorted action into a "widespread practice." Rather, PHV points to distinct acts by different municipal employees, ranging from an administrative assistant, the City's Chief Building Official, to the City Attorney.

As to the second prong of *Monell* liability, Plaintiff must identify the policymaker who "possesses final authority to establish municipal authority with respect to the action ordered." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 602 (5th Cir. 2001) (quoting *Brady v. Fort Bend*

*County*, 145 F.3d 691, 698 (5th Cir. 1998)). This prong "requires actual or constructive knowledge of the policymaker." *Jean v. Guyger*, No. 3:18-cv-02862-M-BH, 2023 WL 6388534, at *6 (N.D. Tex. Sept. 29, 2023). "[T]he identity of [a] policymaker is a question of law, not fact—specifically, a question of state law." *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988)).

Under Texas law, the final policymaker for the City of Kerrville is the City Council. *Cf. Gaumond v. City of Dallas*, No. 3:21-CV-624-E, 2023 WL 2061170, at *8 (N.D. Tex. Feb. 15, 2023) (noting that the "Fifth Circuit has previously determined that, under Texas law, the final policymaker for the City of Dallas is the Dallas City Council," and so "to state a claim for damages against the City of Dallas, Plaintiff must plausibly allege that his federal constitutional rights were violated as a result of an official policy promulgated or ratified by the Dallas City Council").[33]

But PHV fails to identify a policymaker, much less one with any knowledge of an alleged constitutional violation.

The record reveals, at best, that the City employee who changed PHV's permit to a "shell-only" permit was an administrative assistant, Dorothy Miller. Administrative assistants are far removed from the realm of a policymaker capable of triggering municipal liability. Nor is there any evidence in the record that Ms. Miller changed this permit in a "deliberate" manner. *Brown*, 520 U.S. at 494. Likewise, the Stop Work Order was issued by Stephen Riggs, Kerrville's building inspector. But a building inspector's "job [is] to execute or administer the city policy, established by the city council in its building code," and thus is not a policymaker either. *Bennett v. City of Sidell*, 728 F.2d 762, 770 (5th Cir. 1984). The same is true for the Chief Building Official, who is also executing or administering City policy.

---

[33] Like *Gaumond*, PHV does not challenge an official policy or custom of Kerrville. Rather, it alleged that its rights were violated "because of the isolated actions of City employee[s] who did not follow the City's official policy." *Id.*

Even the BBAA itself is not a policymaker, as it was created by the City to hear appeals and grant variances—i.e., "execut[ing] or administer[ing] the city policy." *Id.* Indeed, one hallmark of a policymaker is that his or her decision cannot be appealed. *See Bennett*, 728 F.2d at 770. A lack of appealability suggests that the decision has been made by "a final decisionmaker[ ]." *Brown*, 520 U.S. at 410; *see also Bolton v. City of Dallas*, 541 F.3d 545, 551 (5th Cir. 2008) (while "review procedures can be relevant to showing that an official is *not* a final policymaker," "neither complete discretionary authority nor the unreviewability of such authority automatically results in municipal liability"). The BBAA's decisions by statute *are* directly appealable to the City Council. So are the Chief Building Officials decisions, which can be appealed to the BBAA.

The only policymaker here is the City Council itself, which has final decision-making and policymaking authority. *See Bolton*, 541 F.3d at 550; KERRVILLE CODE OF ORDINANCES, ARTICLE II, SEC. 2.01 ("all powers of the City shall be vested in a Council of five (5) members, to be known as the Kerrville City Council"). But the only action by the City Council challenged in this case is the denial of PHV's initial appeal of the occupancy code determination. Nothing in the record suggests that this denial was a "deliberate" attempt to deprive PHV of its property rights. Instead, in denying PHV's request for a different occupancy determination, the City Council itself pointed to fire safety concerns. *See* ECF No. 112-3 at 238 ("I couldn't live with myself if I felt that something happened and we had, and there was a fire."). Nor is there any evidence in the record demonstrating that the City Council understood the Building Permit to be "unrestricted" or intentionally applied the wrong standard of review.[34]

Further, "the Constitution does not mandate error-free decision making," *Ramirez v. Ahn*, 843 F.2d 864, 869 (5th Cir. 1988), nor does "the due process clause . . . require a [municipality] to

---

[34] PHV's own citation establishes that Mr. Paxton, the City's Corporate Representative, suggested the variance, not the City Council itself. *See* ECF No. 112-3 at 213.

implement its own law correctly," *DM Arbor Court, Ltd. v. City of Houston*, No. H-18-CV-1884, 2021 WL 4926015, at *28 (S.D. Tex. Oct. 21, 2021) (quoting *FM Props. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)); *see Robles v. San Patrico County*, 2:21-CV-180, 2022 WL 2619850, at *6 (S.D. Tex. June 6, 2022) (no due process claim where property owner gave a presentation and the entire Commissioners Court unanimously voted to deny the variance request, even if improper hearing procedures were used). Because "a violation of [municipal] law alone is insufficient to state a constitutional claim," *DM Arbor Ct. Ltd.*, 2021 WL 4926015 at *28 (citation omitted), even if the City Council did err in considering the appeal under an improper standard, this would not establish a Fourteenth Amendment violation.

## PHV'S MOTION FOR PARTIAL SUMMARY JUDGMENT

As a remedy for its Section 1983 claims, PHV seeks a writ of mandamus to compel the City to "hear the appeals" to which PHV is "entitled." ECF No. 25 at 13. PHV bases its request for mandamus relief on the same set of facts as its substantive and procedural due process claim. *See* ECF No. 104 at 17–19. PHV asserts that the City has placed it in a "catch-22" scenario, by which it cannot comply with what the City requires and thus cannot ever get its appeal. *See* ECF No. 104 at 17–19. PHV's motion for partial summary judgment seeking mandamus relief falls with its Section 1983 claims.

"Only a showing of 'exceptional circumstances amounting to a judicial usurpation of power' or 'a clear abuse of discretion' will justify granting a mandamus petition." *Id.* (quoting *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citations and internal quotation marks omitted)). "Mandamus is appropriate where (1) the petitioner has shown a 'clear and indisputable' right to the writ; (2) the court is 'satisfied that the writ is appropriate under the

circumstances'; and (3) the petitioner has 'no other adequate means to attain the relief [it] desires.'" *Id.* (citation omitted).

PHV seeks mandamus under the All Writs Act, 28 U.S.C. § 1651, which gives federal courts the authority to issue writs of mandamus "in aid of their respective jurisdiction and agreeable to the usages and principles of law." *See also Stern v. South Chester Tube Co.*, 390 U.S. 606, 608 (1968) (writ of mandamus under the All Writs Act "can only issue in aid of jurisdiction acquired to grant *some other form of relief*") (emphasis added). In other words, "the All Writs Act . . . does not provide an independent basis for mandamus jurisdiction." *Neuman v. Blackwell*, 204 F. App'x 348, 349 (5th Cir. 2006).

PHV asserted substantive and procedural due process claims under Section 1983, which gave the Court jurisdiction over the City. Because the City prevails on summary judgment against PHV, there is no mandamus relief that would "aid" PHV's resolution of its claims as there are no claims left. Nor does the Court have jurisdiction over the City in the abstract. Federal courts are not appellate bodies of municipal building boards or city councils.

Although the Court need not address the elements for mandamus, it notes that PHV would fail on this front as well. First, PHV does not have a "clear and indisputable" right to have the City "hear" its appeal. The City's refusal to hear its recent appeals are the result of PHV's own noncompliance with the City Code. Second, it would be inappropriate for a federal court to order the City to change its own reading of its own law based on PHV's interpretation. Indeed, "review of municipal zoning . . . should seldom be the concern of federal courts." *Shelton v. City of Coll. Station*, 780 F.2s 475, 477 (5th Cir. 1986) (en banc). Third, PHV has another "adequate means to attain the relief [it] desires": comply with the City's requests. That PHV would prefer to have the City reverse its permitting decisions has no effect on the availability of this relief.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 108) is **GRANTED**, Plaintiff's motion for partial summary judgment (ECF No. 104) is **DENIED**, Plaintiff's motions to exclude certain expert testimony (ECF Nos. 106, 107) are **DENIED AS MOOT**, and Plaintiff's opposed motion to stay the Court's determination (ECF No. 118) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendant are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff shall take nothing in this case against Defendant. A final judgment pursuant to Rule 58 will follow.

It is so **ORDERED**.

**SIGNED** this 11th day of October, 2024.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE